O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| NATIONAL BANK OF CALIFORNIA | ) ) | Case No. CV 12-05171 JGB (MRWx) |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **ORDER RE MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |
| PROGRESSIVE CASUALTY INSURANCE COMPANY | ) ) ) | |
| Defendant. | ) ) | |

_____

Before the Court are (1) Plaintiff National Bank of California's ("the Bank") Motion for Partial Summary Judgment as to Defendant Progressive Casualty Insurance Company's ("Progressive") Fifth Affirmative Defense (Doc. No. 22); (2) the Bank's Motion for Partial Summary Judgment as to the Issue of Cessation and Progressive's Third and Eighth Affirmative Defenses (Doc. No. 40); and (3) Progressive's Motion for Partial Summary Judgment on the Issue of Pre-Tender Fees and the Bank's Claim for Breach of the Covenant of Good Faith and Fair Dealing (Doc. No. 60).

After considering all papers submitted in support of and in opposition to the motions, as well as the arguments advanced by counsel at the April 1, 2013 hearing, the Court (1) DENIES the Bank's Motion for Summary Judgment on Progressive's Fifth Affirmative Defense and GRANTS summary judgment in favor of Progressive on its Fifth Affirmative Defense;(2) DENIES AS MOOT the Bank's Motion for Summary Judgment as to the Issue of Cessation; (3) DENIES the Bank's Motion for and Progressive's Request for Summary Judgment on Progressive's Third and Eighth Affirmative Defenses; (4) GRANTS Progressive's Motion for Summary Judgment as to the Issue of Pre-Tender Fees; and (5) DENIES Progressive's Motion for Summary Judgment as to the Bank's claim for Breach of the Covenant of Good Faith and Fair Dealing.

## I.   BACKGROUND

### A.   Procedural Background

On May 14, 2012, the Bank filed its Complaint against Progressive in the California Superior Court for the County of Los Angeles, alleging claims for breach of contract and breach of the covenant of good faith and fair dealing.  (See Notice of Removal ("Not."), Ex. A ("Complaint") (Doc. No. 1).)  Progressive removed the

1  action to this Court on June 13, 2012.  (Not.)  The Bank
2  filed its First Amended Complaint ("FAC") on November 5,
3  2012 (Doc. No. 18), and Progressive filed its Answer and
4  Affirmative Defenses to the FAC on November 16, 2012
5  (Doc. No. 19.)

6

7      The Bank filed its Motion for Partial Summary
8  Judgment as to Progressive's Fifth Affirmative Defense
9  ("MSJ" or "Bank MSJ 1")[1] on December 19, 2012, along with
10 its Statement of Undisputed Facts ("SUF" or "Bank MSJ 1
11 SUF") (Doc. No. 23); Declaration of Marci A. Reichbach,
12 attaching various exhibits (Doc. No. 24); a Declaration
13 of Steven L. Bergh, attaching various exhibits (Doc. No.
14 25); a Declaration of Henry P. Homsher, attaching one
15 exhibit (the Directors & Officers Liability Policy at the
16 center of this dispute) (Doc. No. 26); and a Declaration
17 of Stephen S. Monroe, attaching various exhibits (Doc.
18 No. 27).  On January 11, 2013, Progressive filed its
19 Opposition ("Opp'n" or "Bank MSJ 1 Opp'n") (Doc. No. 33),
20 along with its Statement of Genuine Issues ("SGI" or
21 "Bank MSJ 1 SGI") (Doc. No. 35); a Declaration of David
22 J. Billings, attaching various exhibits (Doc. No. 34);
23 and a Request for Judicial Notice ("RJN") of the

24 _____

25      [1] For clarity and brevity, the Court will cite
   documents as "Bank MSJ 1," "Bank MSJ 1 Opp'n," etc., only
26 when they are referenced outside the Part of this Order
   that is determining that Motion.  For example, the Bank's
27 first Motion for Partial Summary Judgment will be cited
   as "MSJ" in Part III, *infra*, but as "Bank MSJ 1" in all
28 other Parts.

1  California Superior Court's ruling on the Bank's motion
2  to compel arbitration in the underlying litigation (Doc.
3  No. 36).[2]  The Bank filed its Reply on January 18, 2013
4  ("Reply" or "Bank MSJ 1 Reply") (Doc. No. 39), along with
5  its Reply Statement of Undisputed Facts ("Reply SUF" or
6  "Bank MSJ 1 Reply SUF") (Doc. No. 39-1.)

7

8      The Bank filed its Motion for Partial Summary
9  Judgment as to the Issue of Cessation and Progressive's
10  Third and Eighth Affirmative Defenses ("MSJ" or "Bank MSJ
11  2") on January 24, 2013, along with its Statement of
12  Undisputed Facts ("SUF" or "Bank MSJ 2 SUF") (Doc. No.
13  40-1); a Declaration of Marci A. Reichbach, attaching
14  various exhibits (Doc. No. 42); a Declaration of Steven
15  L. Bergh, attaching various exhibits (Doc. No. 43); a
16  Declaration of Henry P. Homsher, attaching various
17  exhibits (Doc. No. 44); and a Declaration of Stephen S.
18  Monroe, attaching various exhibits (Doc. No. 45).  On
19  March 1, 2013, Progressive filed its Opposition ("Opp'n"
20  or "Bank MSJ 2 Opp'n") (Doc. No. 58), along with its
21  Statement of Genuine Issues ("SGI" or "Bank MSJ 2 SGI")
22  (Doc. No. 58-1); a Declaration of David J. Billings,
23  attaching various exhibits (Doc. No. 58-2); and a Request
24

25      [2]  The Court grants Progressive's RJN, as the
26  submitted document is a court filings and thus
   appropriate for judicial notice.  See Reyn's Pasta Bella,
27  LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir.
   2006) (citing Burbank-Glendale-Pasadena Airport Auth. v.
28  City of Burbank, 136 F.3d 1360, 1364 (9th Cir. 1998)).

for Judicial Notice of three court filings (Doc. No. 62), which the Court grants as the court filings are judicially noticeable.  The Bank filed its Reply on March 18, 2013 ("Reply" or "MSJ 2 Reply") (Doc. No. 77), along with its Reply Statement of Undisputed Facts ("Reply SUF" or "MSJ 2 Reply SUF") (Doc. No. 77-1) and Evidentiary Objections (Doc. No. 77-2).

    Progressive filed its Motion for Partial Summary Judgment on the Issue of Pre-Tender Fees and the Bank's Claim for Breach of the Covenant of Good Faith and Fair Dealing ("MSJ" or "Progressive MSJ") on March 1, 2013, along with its Statement of Undisputed Facts ("SUF" or "Progressive MSJ SUF") (Doc. No. 60-1); a Declaration of David DiBiase, attaching various exhibits (Doc. No. 60-2); a Declaration of John Cullen, attaching various exhibits (Doc. No. 60-3); a Declaration of David Billings (Doc. No. 60-4), attaching various exhibits (Doc. Nos. 60-4, 5, 6, 7); and a Request for Judicial Notice of three court filings (Doc. No. 62), which the Court grants as the court filings are judicially noticeable.  On March 11, 2013, the Bank filed its Opposition ("Opp'n" or "Progressive MSJ Opp'n") (Doc. No. 69), along with its Statement of Genuine Issues and Additional Undisputed Facts ("SGI" or "Progressive MSJ SGI") (Doc. No. 69-1); Evidentiary Objections (Doc. No. 69-2); a Declaration of John N. MacLeod, attaching various exhibits (Doc. No. 69-

3); a Declaration of Stephen S. Monroe, attaching various exhibits (Doc. No. 69-4); and a Declaration of Steven L. Bergh, attaching various exhibits (Doc. No. 69-5).  On March 18, 2013, Progressive filed its Reply ("Reply" or "Progressive MSJ Reply") (Doc. No. 75) and Reply to the Bank's Statement of Additional Undisputed Facts ("Reply SGI" or "Progressive MSJ Reply SGI") (Doc. No. 76).

**B.   Preliminary Matters**

**1.   Federal Rule of Civil Procedure 56(f)**

In its oppositions to the Bank's two MSJs, Progressive asks the Court to deny the motions and instead grant summary judgment on those issues in Progressive's favor.  (See Bank MSJ 1 Opp'n at 2; Bank MSJ 2 Opp'n at 2.)  Under Rule 56(f),[3] the Court may independently grant summary judgment in favor of the nonmoving party.  Progressive's SGIs filed with its oppositions include Statements of Additional Undisputed Facts ("Bank MSJ 1 SAUF" and "Bank MSJ 2 SAUF"), which the Bank replies to in its Reply SUFs.  The Court relies on these filings in determining whether the submitted evidence is sufficient to grant summary judgment in favor of the nonmoving party under Rule 56(f).

---

[3] Unless otherwise noted, all references to "Rule" pertain to the Federal Rules of Civil Procedure.

1
2

## II.   LEGAL STANDARD

3      A motion for partial summary adjudication is governed
4  by the same standard as a motion for summary judgment.
5  Green v. Sun Life Assur. Co. of Canada, 383 F. Supp. 2d
6  1224, 1226 (C.D. Cal. 2005).  A court shall grant a
7  motion for summary judgment when there is no genuine
8  issue as to any material fact and the moving party is
9  entitled to judgment as a matter of law.  Fed. R. Civ. P.
10  56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
11  247-48 (1986).  The moving party must show that "under
12  the governing law, there can be but one reasonable
13  conclusion as to the verdict."  Anderson, 477 U.S. at
14  250.

15

16      Generally, the burden is on the moving party to
17  demonstrate that it is entitled to summary judgment.  See
18  Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998)
19  (citing Anderson, 477 U.S. at 256-57); Retail Clerks
20  Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030,
21  1033 (9th Cir. 1983).  The moving party bears the initial
22  burden of identifying the elements of the claim or
23  defense and evidence that it believes demonstrates the
24  absence of an issue of material fact.  Celotex Corp. v.
25  Catrett, 477 U.S. 317, 323 (1986).  Because summary
26  judgment is a "drastic device" that cuts off a party's
27  right to present its case to a jury, the moving party
28

bears a "heavy burden" of demonstrating the absence of any genuine issue of material fact.  <u>See</u> <u>Avalos v. Baca</u>, No. 05-CV-07602-DDP, 2006 WL 2294878 (C.D. Cal. Aug. 7, 2006) (quoting <u>Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.</u>, 182 F.3d 157, 160 (2d Cir. 1999)).

Where the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case.  <u>Celotex</u>, 477 U.S. at 325. Instead, the moving party's burden is met by pointing out that there is an absence of evidence supporting the non-moving party's case.  <u>Id.</u>; <u>Horphag Research Ltd. v. Garcia</u>, 475 F.3d 1029, 1035 (9th Cir. 2007).  "[A] summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  <u>Celotex</u>, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c)).

The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial.  Fed. R. Civ. P. 56(c); <u>Celotex</u>, 477 U.S. at 324; <u>Anderson</u>, 477 U.S. at 256.  The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322; <u>Anderson</u>, 477 U.S. at 252.  <u>See also</u> William W.

Schwarzer, A. Wallace Tashima & James M. Wagstaffe,
Federal Civil Procedure Before Trial § 14:144.  A genuine
issue of material fact will exist "if the evidence is
such that a reasonable jury could return a verdict for
the non-moving party."  Anderson, 477 U.S. at 248.

In ruling on a motion for summary judgment, a court
construes the evidence in the light most favorable to the
non-moving party.  Scott v. Harris, 550 U.S. 372, 378,
380 (2007); Barlow v. Ground, 943 F.2d 1132, 1135 (9th
Cir. 1991); T.W. Elec. Serv. Inc. v. Pac. Elec.
Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).

**III.  THE BANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PROGRESSIVE'S FIFTH AFFIRMATIVE DEFENSE**

**A.   Undisputed Facts**

The following material facts are sufficiently
supported by admissible evidence and are uncontroverted.
They are "admitted to exist without controversy" for
purposes of the Bank's MSJ 1.  L.R. 56-3 (facts not
"controverted by declaration or other written evidence"
are assumed to exist without controversy); Fed. R. Civ.
P. 56(e)(2) (stating that where a party fails to address
another party's assertion of fact properly, the court may
"consider the fact undisputed for purposes of the
motion").

## 1. The Directors & Officers Liability Policy

Progressive issued a Directors & Officers Liability Policy to the Bank on October 30, 2010 ("Policy"). (SUF ¶ 1; SGI ¶ 1; Homsher Decl., Ex. A ("Policy").) The Policy contains three documents: the Declarations Page ("Declarations" (Policy at 4-6));[4] the standard policy ("D&O Policy" (id. at 7-23); and the attached Endorsements that modify the standard policy (id. at 24-56). The Declarations Page sets forth that **"Defense Costs** are included within the Limit of Liability." (Id. at 4.)[5] Item 6 of the Declarations states under the heading **"Defense Option"** that "[i]t shall be the duty of the **Insured** and not the duty of the **Insurer** to defense **Claims** unless the 'Insurer's Duty to Defend' is designated 'yes' below." (Id.) The only duty to defend designated "yes" is "Employment Practices Liability," the following are designated "no": D&O Liability, Broad Form Lender Liability, Securities Liability, Fiduciary Liability, Bankers Professional Liability, and Privacy Liability. (Id.)

---

[4] The Policy contains the Declarations Page, the standard policy itself, and multiple attached Endorsements. As these documents constituting the full Policy are all separately paginated, the page citations used by the Court throughout this Order refer to the page numbers in the electronic document stamp at the top of the page.

[5] All bolding in quotes from the Policy appear in the original.

1

2     Item 14 of the Declarations, under the heading

3  "**Endorsements,**" states that the "**Policy** is subject to the

4  terms of the following Endorsements attached hereto and

5  incorporated herein at the effective date of this

6  **Policy.**"  (<u>Id.</u> at 5.)  Item 14 then lists the four-digit

7  form numbers that refer to the separately paginated forms

8  attached to the end of the Policy, including Form No.

9  2264.  (<u>Id.</u>)  Form No. 2264 ("Fraud Exclusion

10 Modification") contains the header, "**Fraud/Violation of**

11 **Law Exclusion Modification,**" and, on the next line,

12 "**Change 'final adjudication' to 'in fact.'**" (<u>Id.</u> at 30.)

13 The words of the headers appear in larger type than the

14 text below it. (<u>Id.</u>)  The Fraud Exclusion Modification

15 states,

16        In consideration of the premium paid and in
         reliance upon all statements made and information
17       contained in the Declarations and **Application**, the
         **Insurer** and the **Insured** agree that the
18       "Fraud/Violation of Law Exclusion" is deleted and
         replaced as follows:
19
         **Fraud/Violation of Law Exclusion** - The **Insurer**
20       shall not be liable to make any payment for **Loss**,
         in connection with any **Claim** arising out of or in
21       any way involving, in fact, any fraudulent,
         dishonest or criminal act or any willful violation
22       of any civil or criminal statute, regulation or
         law by the **Insured.**
23
         This Endorsement shall be effective as of 12:01
24       a.m. on 10/30/2010
25       Nothing herein contained shall be held to vary,
         alter, waive or extend any of the terms,
26       conditions, provisions, agreements or limitations
         of the **Policy** other than as above stated.
27 (<u>Id.</u>)

28

This Endorsement purports to delete and replace the standard D&O Policy language, which appears under the header "**Fraud/Violation of Law Exclusion**," which states,

> The **Insurer** shall not be liable to make any payment for **Loss**, other than **Defense Costs**, in connection with any **Claim** arising out of or in any way involving any fraudulent, dishonest or criminal act or any willful violation of any civil or criminal statute, regulation or law by the **Insured**, provided a final judgment or final adjudication establishes such fraudulent, dishonest, or criminal act or such willful violation of statute, regulation or law.

(Id. at 13.)

The Policy defines Loss as "**Defense Costs** and any amount which the **Insured** is legally obligated to pay resulting from a **Claim**, including damages, judgments, settlements, and pre- and post-judgment interest." (Id. at 10.)  The Policy's final provision, aside from the attached Endorsements, states under the heading "**Headings and Sub-Headings**," "The descriptions in the headings and sub-headings of this **Policy** are solely for convenience and form no part of the terms and conditions of coverage." (Id. at 23.)

The Fraud Exclusion Modification quoted above and all other Endorsements were contained within the Policy at the time the Policy was executed by the Bank and Progressive.  (See SUF ¶ 1; SGI ¶ 1; Homsher Decl. ¶ 3.)

1

## 2.  Arbitrator's Findings and Award in Underlying Litigation

2

3

On January 19, 2011, Bruce Porter ("Porter"),
individually and as Trustee of the Porter Trust, and
Tracey Corner, as Trustee of the Bruce Porter Insurance
Trust ("Porter Parties"), filed a lawsuit in the
California Superior Court for the County of Los Angeles
against the Bank, Zey Financial and Insurance Services
("Zey Financial"), Igor Zey, and Lincoln National Life
Insurance Company ("Lincoln Insurance").  (See Monroe
Decl. ¶ 1, 3, Ex. A (attaching the Complaint in Bruce
Porter, et al. v. Zey Financial & Ins. Servs., Inc., et
al. (Super. Ct. Los Angeles Cnty., 2011, No. SC-
111109)).)  The Porter Parties alleged claims for fraud,
conspiracy to defraud, violation of Cal. Bus. & Profs.
Code § 17200, breach of fiduciary duty, intentional
infliction of emotional distress, and tort of another.
(Monroe Decl., Ex. A.)  The Porter Parties filed amended
complaints (Monroe Decl., Exs. B-D), and the Zey parties
filed a cross-complaint and an amended cross-complaint
against the Bank, seeking indemnity and damages.  (Id. ¶
5; Exs. E-F.)

The dispute was designated for arbitration upon the
Bank's motion and, on February 17, 2011, the Arbitrator,
Jack M. Newman ("Arbitrator"), issued his final Findings
and Award ("Award.")  (Monroe Decl., Ex. K.)  On May 25,

13

2012, the California Superior Court for the County of Los Angeles issued an order confirming the Award, and entered a judgment on July 19, 2012.  (See Bank MSJ 2 Monroe Decl., Ex. O (July 19, 2012 Judgment) (Doc. No. 45-3).) The Court adopts the Arbitrator's factual findings, none of which is disputed by the parties or contradicted by the submitted evidence.  (See SUF ¶¶ 10-18; SGI ¶¶ 10-18).  See Amaro v. Cont'l Can Co., 724 F.2d 747, 753 (9th Cir. 1984) (stating that district courts defer as appropriate to an "arbitrator's findings on factual matters"); Carpenters 46 N. Cal. Counties Conf. Bd. v. Zcon Builders, 96 F.3d 410, 413 (9th Cir. 1996) (stating that an arbitrator's factual findings receive deferential review in the Ninth Circuit).

At the outset, the Arbitrator summarized the dispute as the Bank's seeking repayment of its $685,000 loan from Tracey Porter, in her capacity as the Trustee of the Bruce Porter Life Insurance Trust, and the Porter Parties' countering that they are not liable because "there was fraud in the execution of the loan documents, that none of the Porters knew that the Porter Insurance Trust was borrowing $685,000, or that Bruce Porter and the Porter Living Trust were guaranteeing repayment of the loan."  (Award at 1 (summarizing the Porter Parties' defenses).)

The Arbitrator then related the underlying facts of Bruce Porter's purchase of the $6,000,000 life insurance policy from Lincoln Insurance. (Id.)  Porter, who was 79 years old in 2008 (RJN, Ex. A (Superior Court's May 23, 2011 Ruling)), developed an interest in the secondary market for life insurance policies and was introduced to Igor Zey, an insurance broker. (Award at 2.)  Porter testified that he was told he could make a profit of $800,000 by selling his life insurance policy on the secondary market. (Award at 2.)  Porter purchased the life insurance policy and borrowed $685,000 from the Bank. (Id. at 1-2.)

On August 28, 2008, the transaction was executed at a document signing meeting attended by Bruce Porter, Linda Porter, Tracey Porter, Zey, Mark Hathaway (acting as the Bank's agent in the transaction), and Julio Avila, the bank's representative, who attended the meeting by speaker-phone. (Id. at 2.)  The Porters testified that the Bank never told them about the $685,000 loan and that their signing of 15 documents at the meeting "was handled in such a way that none of them was able to read any of [the documents]." (Id.)  "Moreover, none of the Porters received copies of any of those documents, either before, during, or after the signing ceremony." (Id.)

1        The Arbitrator found the Porters' testimony credible,
2   citing evidence establishing that the Porters did not
3   know about the loan at any point before the document
4   signing and were not told about the loan by Zey, the
5   Bank's agent (Hathaway), or the Bank's representative
6   (Avila).  (Id.)

7

8        The Arbitrator found that the Bank offered "Estate
9   Protector Loan[s] so that it could profit from the
10  secondary market for life insurance policies."  (Id. at
11  3.)  From 2006 until 2009, the Bank made approximately 30
12  Estate Protector Loans to persons between the ages of 70
13  and 90.  (Id.)  The Arbitrator found that "witnesses
14  affiliated with [the Bank]" provided testimony that was
15  not credible and contrary to the evidence when they
16  averred that they did not know the borrowers intended to
17  sell the life insurance policies in the secondary market
18  after holding it for the required two years.  (Id.)  The
19  Bank was the only bank "in the Los Angeles area" making
20  these kinds of loans during this period.  (Id.)  The
21  Arbitrator found that "[l]ife insurance companies were
22  opposed to selling policies to anyone who intended to
23  resell them in the secondary market, and had such a
24  restrictive provision in their applications."  (Id.)

25

26       The Arbitrator stated that the Porter Parties'
27  "defense is based on fraud in the execution, or fraud in

28

the inception, irrespective of [the Bank's] intent.  The
case of Duick v. Toyota Motor Sales, USA, Inc., 198
Cal.App.4th 1316 (2011) [sic] supports this position, as
does Betty Crick v. Louis Silviera Jr., 2011 WL 3106704
(Cal.App.3rd Dist.2011) [sic]."  (Id. at 4.)  He concluded
"that the loan agreement is not enforceable because of
fraud in the execution, or inception" and that the
Porters, as the prevailing parties, were entitled to
$275,000 in attorneys' fees and $23,000 in costs.  (Id.)

### 3.   Progressive's Denial of the Bank's Claim

     The Bank tendered the Porter Claim to Progressive
pursuant to the D&O Policy on February 17, 2011.  (SUF ¶
19; SGI ¶ 19.)  On May 9, 2012, Progressive sent the Bank
a letter via email denying coverage for the Porter Claim.
(SUF ¶ 21; SGI ¶ 21; Bergh Decl., Ex. A ("Denial
Letter").)  In the Denial Letter, Progressive wrote,
"Based primarily on the findings in the [Arbitration]
Award, but also based upon the information learned from
the Porter Trust pleadings, Progressive has concluded
that it owes no obligation to the Bank to pay any form of
"Loss" as the term is defined in the D&O Policy,
including Defense Costs."  (Denial Letter at 1.)  The
Denial Letter then cites the Fraud Exclusion Modification
as the justification for its denial of the Claim, stating
that "all defense costs coverage otherwise applicable was

voided as a consequence of the [Arbitrator's] fraud determination." (Id. at 4.)  Plaintiff is a commercial bank.  (SAUF ¶ 35; Reply SAUF ¶ 35.)

**B.   Genuine Issues of Material Fact**

The Court finds that neither the Bank nor Progressive has submitted evidence to establish that any material fact in this matter is disputed.  All of the purportedly disputed facts in Progressive's SGI and the Bank's Reply SGI are contentions about relevance, materiality, or conclusions of law regarding interpretation of the contractual terms.  Thus, as there is no genuine issue as to any material fact, the Court considers whether the moving party, under Rule 56(a), or the nonmoving party, under Rule 56(f), is entitled to judgment as a matter of law.  See Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 18 (1995) ("[I]nterpretation of an insurance policy is a question of law.").

**C.   Judgment as a Matter of Law**

The parties request summary judgment on Progressive's Fifth Affirmative Defense in the Answer, which states, "As a separate and distinct affirmative defense, PROGRESSIVE alleges that any damages sustained or legal fees expended by Plaintiff as respects the Porter Matter are excluded under the Fraud/Violation of Law Exclusion

as modified by Endorsement to the Policy." (Answer to
the FAC ¶ 78.)  The Bank argues that Progressive's denial
of its Claim violates the Policy because, for the Fraud
Exclusion Modification to apply, the alleged fraud must
have been committed with "wrongful intent," and, as a
matter of law, the Bank did not commit fraud with
wrongful intent.  (MSJ 1 at 6-10.)  Alternatively, the
Bank argues that the Fraud Exclusion Modification is
unenforceable because it was not "conspicuous, plain and
clear" in the Policy and because it was "deceptive."
(Id. at 10-16.)

### 1. Whether the Arbitration Award Triggered the Fraud Exclusion Modification

#### a. Governing Legal Standard

"Under California law, the insured has the burden of
showing that an event falls within the scope of basic
coverage under the policy."  Valley Cmty. Bank v.
Progressive Cas. Ins. Co., 854 F. Supp. 2d 697, 703 (N.D.
Cal. 2012) (citing Garvey v. State Farm Fire & Casualty
Co., 48 Cal.3d 395, 406 (1989)).  Insurance policies,
like other contracts, are to be interpreted in light of
"the mutual intention of the parties as it existed at the
time of contracting."  Cal. Civ. Code § 1636; see
Frontier Oil Corp. v. RLI Ins. Co., 153 Cal. App. 4th
1436, 1462 (2007) (stating that the same rules of
interpretation apply to insurance policies as apply to

19

contracts generally).  Courts are to interpret insurance
clauses "broadly, consistent with the reasonable
expectations of the insured."  Frontier Oil Corp.,153
Cal. App. 4th at 1462.  "An exclusion from coverage
otherwise within the scope of an insuring clause must be
clear and unmistakable to be given effect."  Id.
Endorsements, which can be attached to the insurance
policy at its inception or can be added during the
policy's term, "form a part of the insurance contract,
and the policy of insurance with the endorsements and
riders thereon must be construed together as a whole."
Adams v. Explorer Ins. Co., 107 Cal. App. 4th 438, 451
(2003) (internal quotation marks and citations omitted).

Courts determine the mutual intention of the parties
"solely from the written provisions of the contract,"
where possible.  Waller, 11 Cal. 4th at 18.  "If the
policy language is clear and explicit, it governs."
Rosen v. State Farm Gen. Ins. Co., 30 Cal. 4th 1070, 1074
(2003) (internal citations and quotation marks omitted).
"Although ambiguities in the contract language will be
construed against the insurer, the court should not
search for an ambiguity when the policy terms are clear.
Thus, a claim of ambiguity cannot be based on a strained
interpretation of the policy terms."  Valley Cmty. Bank,
854 F. Supp. 2d at 703 (citing Mitsui Mfrs. Bank v. Fed.
Ins. Co., 795 F.2d 827, 829 (9th Cir. 1986).

1               **b.   Relevant Precedent**

2

3        In arguing that "wrongful intent is required to apply

4   the [Fraud Exclusion Modification]" (MSJ at 6), the one

5   authority the Bank relies on is a 1987 Fifth Circuit case

6   involving Texas law, <u>Brooks, Tarlton, Gilbert, Douglas &</u>

7   <u>Kressler v. U.S. Fire Ins. Co.</u>, 832 F.2d 1358 (5th Cir.

8   1987).  Progressive has not provided a more analogous

9   case, nor is the Court aware of one.  One of the issues

10  before the <u>Brooks</u> court was whether an exclusion in an

11  insurance policy for "dishonest, fraudulent, criminal or

12  malicious" acts encompassed "constructive fraud," a

13  question that turned on whether the policy's use of

14  "fraudulent" required intent.  <u>Id.</u> at 1369-70.  In its

15  analysis interpreting the policy's use of "fraudulent,"

16  the <u>Brooks</u> court stated, "A sampling of the definitions

17  we have uncovered leads us to the conclusion that the

18  term 'fraud' is generally understood to carry with it the

19  connotation of a wrongful intent."  <u>Id.</u> at 1369.  The

20  Bank thus argues that the language of the Fraud Exclusion

21  Modification "requires a finding of wrongful intent in

22  order to preclude coverage."  (MSJ at 7.)

23

24       The Court, while not bound by <u>Brooks</u>, finds several

25  key distinctions in the instant matter worth noting.  The

26  Bank in its MSJ focuses narrowly on <u>Brooks</u>'s specific

27  analysis of the fraud exclusion.  The Fifth Circuit,

28

though, carefully analyzed the policy as a whole and interpreted the fraud exclusion within that context, as this Court must also do.  See Adams, 107 Cal. App. 4th at 451.  The broad question before the Brooks court was whether the insurer had a duty to defend the claims that were filed against the insured.  The court noted the legal principles distinguishing a "duty to defend" provision from insurance policy provisions, finding that "the principles [regarding an insurance company's latitude in deciding whether to defend] are extremely confining."  Id. at 1367.  The principles and rules under Texas law the Brooks court found applicable included: (1) the duty to defend is determined solely from the face of the pleadings; (2) "if the allegations made against the insured, when taken as true, even *potentially* state a cause of action within the terms of the policy, the insurer must defend"; (3) "the court may indulge the most liberal interpretation of the allegations of which they are susceptible and doubts as to the import of the allegations are to be resolved in favor of the insured and coverage"; and (4)  "as long as the complaint alleges at least one cause of action within the policy coverage, the insurer must defend."  Id. at 1366-67 (internal quotation marks omitted).  These rules and principles would not, however, have applied to a policy provision for indemnity.  The Brooks court stated explicitly that it undertook its analysis of the meaning of "fraudulent"

"[u]nder the liberal interpretation of pleadings standard which the Texas Supreme Court has directed us to apply in determining an insurer's duty to defend." Id. at 1369.

Similarly, in California, it is well established that courts impose a higher standard on insurers seeking to avoid a duty to *defend* provision than they do on insurers seeking to avoid a duty to *indemnify* provision, as Progressive seeks to do here. See Buss v. Superior Court, 16 Cal. 4th 35, 46 (1997) ("Obviously, the insurer's duty to defend is broader than its duty to indemnify."); Horace Mann Ins. Co. v. Barbara B., 4 Cal. 4th 1076, 1081 (1993) (finding the same). There is a strong public policy underlying this principle, which Brooks recognized when quoting a Fourth Circuit opinion on a similar matter: "'While, as noted, there may be sound policy reasons why an insured should not be indemnified from the consequences of acts such as those enumerated,[6] there are no similar reasons why an innocent person, charged with such acts, should not have the benefit of a defense.'"[7] Brooks, 832 F.2d at 1365 (quoting Donnelly v. Transp. Ins. Co., 589 F.2d 761, 763 (4th Cir. 1978)). In the full context of the case,

---

[6] Like the language in Brooks, these included "dishonest, fraudulent, criminal or malicious act[s]." Donnelly v. Transp. Ins. Co., 589 F.2d 761, 763 (4th Cir. 1978).
[7] Brooks disagreed with Donnelly's holding, but not with the policy principles it quoted. See Brooks, 832 F.2d at 1365-66.

1  therefore, the duty to defend clause in <u>Brooks</u> gave the
2  court a heightened interest in construing the fraud
3  exclusion terms narrowly to ensure that the insured would
4  have the defense for which they contracted.
5
6      Further, in addition to the <u>Brooks</u> court's compliance
7  with the particular interpretive rules advantaging the
8  insured imposed by the Texas Supreme Court in duty to
9  defend cases, <u>Brooks</u> involved an allegation of
10 constructive fraud against the insured (a law firm) (<u>id.</u>
11 at 1369), whereas the Porter Matter involved a finding of
12 fraud in inception or execution.[8]  The "benchmark of
13 constructive fraud . . . is the existence of a fiduciary
14 relationship. It is the existence of the relationship . .
15 . which casts doubt on a transaction between the attorney
16 and client and imposes the presumption of 'fraud.'  In
17 order to defeat the presumption, the attorney bears the
18 burden of establishing that the transaction was fair,
19 honest, and equitable."  <u>Id.</u> at 1369.  The court further
20 explained that "it is possible for an attorney to be
21 liable for constructive fraud even though the attorney

---

[8]  The distinctions between fraud in inception and
fraud in execution concern the process of voiding the
contract and are significant primarily with regard to
arbitration contracts.  <u>See</u> <u>Duick v. Toyota Motor Sales,</u>
<u>U.S.A., Inc.</u>, 198 Cal. App. 4th 1316, 1320 (2011).  Most
precedents discuss fraud in inception and fraud in
execution jointly as a category to be distinguished from
"fraud in inducement," which is not relevant here.  <u>See,</u>
<u>e.g.</u>, <u>id.</u> at 1320; <u>Rosenthal v. Great W. Fin. Sec. Corp.</u>,
14 Cal. 4th 394, 415 (1996).  For the purposes of this
analysis, the distinction between inception and execution
is immaterial.  Thus, like the Arbitrator in his Award,
the Court discusses them jointly.

1  operated completely in good faith during the entire
2  transaction." Id.
3
4      Fraud in inception or execution is found where "the
5  promisor is deceived as to the nature of his act, and
6  actually does not know what he is signing, or does not
7  intend to enter into a contract at all." Rosenthal v.
8  Great W. Fin. Sec. Corp., 14 Cal. 4th 394, 415 (1996)
9  (internal quotation marks omitted).  To show fraud in
10 execution, "plaintiffs must show their apparent assent to
11 the contracts—their signatures on the client
12 agreements—is negated by fraud so fundamental that they
13 were deceived as to the basic character of the documents
14 they signed." Id. at 425.  Thus, while neither
15 constructive fraud in Texas nor fraud in inception or
16 execution in California require a finding of willful
17 intent, it is notable that the benchmark of the former is
18 a fiduciary relationship and the benchmark of the latter
19 is deception.
20
21     Despite the apparent similarities between Brooks and
22 this matter, the Court finds that the insurance policy
23 exclusions and the events alleged to have triggered those
24 exclusions at issue are significantly different here than
25 in Brooks and that those distinctions weigh in
26 Progressive's favor.
27
28

### c.   Analysis

Both the Bank and Progressive frame the question of law before the Court as whether the language of the Fraud Exclusion Modification, specifically the word "fraudulent," requires a finding that the fraudulent act was committed with wrongful intent.  (See MSJ at 7-8; Opp'n at 4-5.)   The determinative question, however, is whether it was the mutual intention of the parties, and whether the Bank reasonably expected, to execute an insurance policy containing a fraud exclusion that would be triggered by findings such as those in the Arbitrator's Award.  Cf. Waller, 11 Cal. 4th at 18; Frontier Oil Corp., 153 Cal. App. 4th at 1462.  The Court finds that the Award triggered the Fraud Exclusion Modification for the following reasons.

The clear language of the Policy states, "The Insurer shall not be liable to make any payment for Loss, in connection with any Claim arising out of or in any way involving, in fact, any fraudulent, dishonest or criminal act or willful violation of any civil or criminal statute, regulation or law by the Insured."  (Policy at 30.)   The Court finds that, based solely on this language, a layperson would interpret the words as reflecting the intent to encompass as wide a range of acts as plausible.  See  Waller, 11 Cal. 4th at 18

(stating that courts look to the meaning a layperson would attach to the disputed contractual language).  Each of the following five parts of the Exclusion's first clause are carefully written to emphasize this intent to a layperson: (1) "in connection with"; (2) "*any* Claim"; (3) "arising out of or *in any way involving*"; (4) "in fact"; (5) "*any* fraudulent . . . act."  (Policy at 30 (emphasis added).)  This clause would have been drafted more concisely and without the repetition of "any" had the intention not been to clearly cover all findings of fraud.  The most explicit indication of this intent is the phrase "in any way involving," language that would only be included to maximally expand the enumerated categories of acts.  Furthermore, the Court notes that the broad intent of the Exclusion is also demonstrated by (1) the Exclusion's specific inclusion of "willful" regarding violations of statutes, laws, and regulations, but not regarding "fraudulent . . . acts"; and (2) the absence of a word like "malicious," which appeared in the exclusions in Brooks (832 F.2d at 1369) and Donnelly (589 F.2d 761 at 763).  Thus, the plain language of the Fraud Exclusion Modification establishes the parties' intent to adopt an expansive Fraud Exclusion, not one that parses among different types of fraud.

Moreover, as the Bank points out, the unmodified Fraud Exclusion in the D&O Policy "contained wording that

1  specifically carved out defense costs from the
2  exclusion." (MSJ at 2 (emphasis in original).) This,
3  however, does not weigh in the Bank's favor here. A
4  layperson would interpret the Fraud Exclusion
5  Modification on its own broad terms, but also in relation
6  to the language it deletes and replaces. The Fraud
7  Exclusion Modification, first, deleted the words "other
8  than defense costs," and, second, deleted the qualifying
9  language "provided a final judgment or final adjudication
10 establishes such fraudulent, dishonest, or criminal act,"
11 replacing it with "in fact." The only plausible
12 interpretation of this modification is that Progressive
13 intended to draft an agreement that would minimize its
14 obligation to indemnify the Bank for its defense costs
15 and maximize the ways in which the enumerated acts could
16 trigger the Exclusion. Thus, the differences between the
17 Fraud Exclusion Modification and the unmodified Fraud
18 Exclusion further highlight the parties' intent to adopt
19 an expansive Fraud Exclusion.
20
21     The Court further notes that Plaintiff is a
22 commercial bank (SAUF ¶ 35; Reply SAUF ¶ 35) and was
23 presented with all documents constituting the Policy (the
24 Declarations Page, the D&O Policy, and the Endorsements)
25 at the same time. See Valley Cmty. Bank v. Progressive
26 Cas. Ins. Co., 854 F. Supp. 2d 697, 711 (N.D. Cal. 2012)
27 (denying a bank's claim that an insurance company
28

fraudulently included an "Anti-Bundling" provision in
their Bond partially on the ground that the bank "is a
sophisticated party that had the full terms of the Bond
before it, including the Anti-Bundling clause").  Thus,
while the Court applies the appropriate "layman" standard
to its analysis, the fact that Plaintiff is, as a
commercial bank, a sophisticated party, further
demonstrates that it reasonably expected the Fraud
Exclusion Modification language to cover the "different
varieties of fraud affecting contractual relationships
[under California law]."  <u>Duffens v. Valenti</u>, 161 Cal.
App. 4th 434, 447 (2008).

Finally, the Court assesses whether the intent and
reasonable expectations of the parties, as discussed
above, was to define the Fraud Exclusion Modification
such that it would exclude from coverage the acts found
by the Arbitrator and described in the Award.  The Bank
did not tell the Porters about the loan before the day
the transaction was executed. (Award at 2.)  Neither the
Bank's agent nor the Bank's representative, both present
at the signing meeting, mentioned the loan during the
meeting.  (<u>Id.</u>)  Witnesses affiliated with the Bank
provided testimony that was not credible and was contrary
to the evidence.  (<u>Id.</u>)  Thus, the Bank's loan agreement
with the Porters was "not enforceable because of fraud in
the execution, or inception."  (<u>Id.</u> at 3.)  The

Arbitrator stated that the Porters' defense was based on doctrines not requiring intent, and the Arbitrator thus made no finding as to intent. (Id.)  The Porters were entitled to attorneys' fees and costs.  (Id.)

The Court finds that the plain language of the Fraud Exclusion Modification, viewed in the context of the whole Policy, sufficiently establishes that it was the intent of the signatories and that it was the Bank's reasonable expectation that the Policy would exclude from coverage a category of acts that clearly includes facts like those contained in the Award and described above. Therefore, the Court finds, as a mater of law, that the Bank is not entitled to summary judgment on the ground that the Award did not trigger the Fraud Exclusion Modification.

### 2.   Whether the Fraud Exclusion Modification is Unenforceable

### a.   Governing Legal Standard

"[T]o be enforceable, any provision that takes away or limits coverage reasonably expected by an insured must be 'conspicuous, plain and clear.'" Haynes v. Farmers Ins. Exch., 32 Cal. 4th 1198, 1204 (2004) (quoting Steven v. Fidelity & Casualty Co., 58 Cal.2d 862, 878 (1962)). "[A]ny such limitation must be placed and printed so that

1  it will attract the reader's attention. Such a provision
2  also must be stated precisely and understandably, in
3  words that are part of the working vocabulary of the
4  average layperson." <u>Haynes</u>, 32 Cal. 4th at 1204.
5
6      **b.  Analysis**
7
8      In <u>Haynes</u>, the court found that a clause limiting
9  coverage in a person's automobile insurance policy was
10 unenforceable in part because "the language of the . . .
11 limitation is not bolded, italicized, enlarged,
12 underlined, in different font, capitalized, boxed, set
13 apart, or in any other way distinguished from the rest of
14 the fine print" and consisted of "three lines of ordinary
15 type, in the least conspicuous position on the page."
16 <u>Haynes</u>, 32 Cal. 4th at 1207, 1209.
17
18     The Court finds that the Fraud Exclusion Modification
19 is enforceable as it is conspicuous, plain, and clear.
20 The Policy lists the numbers of the Endorsements on the
21 second page of the Declarations Page, which is the first
22 document contained in the Policy, and explains that the
23 "Policy is subject to the terms of the following
24 endorsements attached hereto and incorporated herein by
25 reference at the effective date of this Policy." (Policy
26 at 5.)  Unlike the endorsements item in the Declarations
27 Page in <u>Haynes</u>, the Policy here includes text explaining
28

"endorsements" and indicating their location in the
Policy.  See Haynes, 32 Cal. 4th at 1202.  The Fraud
Exclusion Modification is located on its own page, with a
bold header in enlarged font, and bold and underline
emphasis in the text.  (Policy at 30.)  The Court finds
that the text is "positioned in a place and printed in a
form which would attract a reader's attention."  Id. at
1207 (internal quotation marks omitted).

     The Bank further argues that the Fraud Exclusion
Modification is inconspicuous and unenforceable because
it is misleading.  (MSJ at 13.)  The Bank submits that
the Exclusion is misleading because its heading states,
"'change final adjudication' to 'in fact,'" but does not
state the deletion of the words "other than Defense
Costs."  (Id.)  The Bank's argument is unavailing.  The
text clearly indicates that the language in the D&O
Policy "is deleted and replaced" with the language in the
Endorsement.  (Policy at 30.)  Further, the Policy states
that the "descriptions in the headings and sub-headings
of this Policy are solely for convenience and form no
part of the terms and conditions of coverage" (id. at
23), a provision consistent with California law.  See
Hervey v. Mercury Cas. Co., 185 Cal. App. 4th 954, 965
(2010) (finding that a "heading is not an operative term
or provision [of an insurance policy] itself").

The Court thus finds that the Fraud Exclusion Modification is sufficiently conspicuous, plain, and clear; that it would attract a reader's attention; and that it is not misleading.  Therefore, the Court finds, as a mater of law, that the Bank is not entitled to summary judgment on the ground that the Fraud Exclusion Modification is unenforceable.

### 3.   Progressive is Entitled to Summary Judgment on its Fifth Affirmative Defense

After finding that the parties set forth no genuine issues of material fact, the Court finds that the Bank, as the moving party, failed to meet its burden of showing it is entitled to summary judgment on Progressive's Fifth Affirmative Defense.  The evidence submitted by both parties establish that the only dispute concerns contractual interpretation, which is a matter of law. The Court finds that the findings in the Arbitrator's Award triggered the Fraud Exclusion Modification and that the Modification is enforceable.  Therefore, under Rule 56(f), the Court GRANTS partial summary judgment in favor of Progressive on its Fifth Affirmative Defense.

**IV. THE BANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE ISSUE OF CESSATION AND PROGRESSIVE'S THIRD AND EIGHTH AFFIRMATIVE DEFENSES**

**A.   Summary Judgment on the Issue of Cessation**

The Bank moves for summary judgment on Progressive's alleged assertion that it is not obligated to indemnify the Bank's Porter Claim on the ground that the claim ceased to be a "claim" under the Policy because of the arbitration.  (See MSJ at 1-2.)

As discussed above, the Court grants summary judgment in favor of Progressive as to its Fifth Affirmative Defense and thus finds that Progressive is not obligated to indemnify the Bank for the costs it incurred in the Porter litigation.  Therefore, the Bank's MSJ on the issue of cessation of the Porter Claim is moot.  The Court thus DENIES AS MOOT the Bank's Motion for and Progressive's Request for Partial Summary Judgment on this issue.

**B.   Summary Judgment on Progressive's Third and Eighth Affirmative Defense**

**1.   Undisputed Facts**

The following material facts are sufficiently supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for

purposes of the Bank's Motion for Partial Summary Judgment.  L.R. 56-3 (facts not "controverted by declaration or other written evidence" are assumed to exist without controversy); Fed. R. Civ. P. 56(e)(2) (stating that where a party fails to address another party's assertion of fact properly, the court may "consider the fact undisputed for purposes of the motion").  To the extent they are material to the Bank's second MSJ, the Court incorporates its findings of undisputed facts from the Bank's first MSJ, as discussed above.

The Bank filed its FAC seeking, in part, defense costs incurred as a result of the Porter Claim as well as five other claims described in the FAC as: the Andrew Gay Matter; the David Kagel Matter; the Ida Pyle, Judith Rudges and Beverly Baker ("PBR") Matter; the Donald Zimmerman Matter; and the Falaguerra Matter.  (SUF ¶ 33; SGI ¶ 33.)  Progressive's counsel sent letters to the Bank's counsel in May and June of 2012 regarding each of the six claims. (SUF ¶¶ 34-40; SGI ¶¶ 34-40.)  The letters Progressive sent contained the following language or substantially similar language:  "The legal fees expended by [the Bank] pursuing its claims against [the borrowers] are not Covered Loss or Defense Costs and will not be reimbursed or applied toward the retention. . . . Thus an allocation of the fees and costs incurred by the

1    Bank based on the relative legal exposure of the Bank to

2    the claims asserted by [the borrowers] and the Bank's

3    pursuit of its claims against [the borrowers] is

4    necessary. . . . [A]n allocation of twenty percent (20%)

5    to covered matters is appropriate." (SUF ¶¶ 34-40; SGI

6    ¶¶ 34-40.)

7

8         Progressive's Third Affirmative Defense in its Answer

9    to the FAC is titled "Legal Fees Incurred By Plaintiff In

10   Pursuit of Its Claims Against Others Are Not a Covered

11   Loss or Defense Costs" and states, "As a separate and

12   distinct affirmative defense, PROGRESSIVE alleges that

13   the legal fees expended by the Plaintiff pursuing its

14   claims against Andrew Gay, David Kagel, Ida Pyle, Judith

15   Rudges, Beverly Baker and Donald Zimmerman are not

16   covered Loss or Defense Costs and are not applied toward

17   the retention pursuant to Section IV of the Policy which

18   define the terms Loss and Defense Costs and Section VI.B.

19   of the Policy." (Answer to FAC ¶ 76; SUF ¶ 42; SGI ¶ 42.)

20

21        The Policy states in Section IV (titled

22   "Definitions"), "**'Loss'** means **Defense Costs** and any

23   amount which the **Insured** is legally obligated to pay

24   resulting from a **Claim**, including damages, judgments,

25   settlements, and pre- and post-judgment interest.  Loss

26   shall also include punitive or exemplary damages and the

27   multiple portion of any multiplied damage award where

28

insurable by law.  **Loss** shall not include [eight
enumerated categories]." (Policy at 10-11; SUF ¶ 7; SGI ¶
7.)

The Policy states in Section IV, "**<u>Defense Costs</u>** means
reasonable and necessary legal fees and expenses incurred
in defending or investigating any **Claim** and the cost of
appeal, attachment or similar bonds.  **Defense Costs** shall
not include salaries, wages, overhead, or benefit
expenses incurred by the **Insured.**" (Policy at 9; SUF ¶
8; SGI ¶ 8.)

Progressive's Eighth Affirmative Defense in its
Answer to the FAC is titled "Allocation" and states: "As
a separate and distinct affirmative defense, PROGRESSIVE
alleges that any damages sustained or legal fees expended
by Plaintiff are subject to allocation in accordance with
Section IX.2. of the Policy."  (Answer to FAC ¶ 81; SUF ¶
43; SGI ¶ 43.)

Subsection IX.A.2[9] of the Policy, an item in the
Section titled "**ALLOCATION,**" states, "If in any **Claim** the
**Insureds** incur any amount consisting of both covered and
uncovered **Loss** because the **Claim** includes both covered
and uncovered matters, then the amount shall be allocated

_____

[9] The Court interprets Progressive's reference to
"Section IX.2 of the Policy" as a reference to Section
IX.A.2, which is quoted in full in Progressive's
Opposition on page 10.

between covered **Loss** and uncovered loss based on the relative legal exposures of the **Insureds** to the covered and uncovered matters." (Policy at 18.)

## 2. Genuine Issues of Material Fact

Neither the Bank nor Progressive purports to dispute any of the other party's submitted facts that the Court finds material to Progressive's Third and Eighth Affirmative Defenses. (See SUF ¶¶ 33-43; SGI ¶¶ 33-43.) Both parties seek summary judgment on these affirmative defenses and thus submit that they are appropriate for judgment as a matter of law. The Court disagrees.

The Bank argues that Progressive's Third Affirmative Defense, as a matter of law, "fails because under the terms of the Policy Progressive's obligation to indemnify [the Bank] for legal fees and expenses is determined solely by whether the fees and expenses were 'reasonable and necessary legal fees and expenses incurred in defending or investigating any claim.'" (SUF – Conclusions of Law ¶ 2.) Progressive contends that its Third Affirmative Defense is not a blanket exclusion and that the Bank has the burden of establishing that its incurred fees "fall within the basic scope of coverage under the Policy, i.e., that they were incurred to defend or investigate a Claim." (Opp'n at 7.) The dispute at

issue does not appear to be based on a question of fact or a question of law, but rather on the parties' failure to understand the other's position.

Progressive's counsel sent three letters, between 13 and 26 pages in length, to the Bank's counsel providing Progressive's "coverage analysis" or "coverage position" with respect to the five relevant borrowers (excluding Porter). (Bergh Decl., Exs. B, C, D.) These letters provide explanations of Progressive's positions. In each letter, there is a subsection titled "Defense Costs/Allocation." (Id., Ex. B at 16; Ex. C at 23; Ex. D at 11.) The first sentence under this heading in each letter states that the Bank "provided Progressive with invoices" from the Bank's counsel representing the amount of fees and costs incurred litigating the underlying actions. (Id., Ex. B at 16; Ex. C at 23; Ex. D at 11.) Progressive then provides a brief summary of why it believes that some of the Bank's purported defense costs are not covered by the Policy. (Id., Ex. B at 16-17; Ex. C at 23-24; Ex. D at 12.)

Progressive's affirmative defense is that the "legal fees expended by the Plaintiff pursuing its claims against [the borrowers] are not covered **Loss** or **Defense Costs** . . . pursuant to [the Policy's definitions of Defense Costs and Loss]." (Answer ¶ 76.) The Bank's

1  asserted conclusion of law is that the legal fees must be
2  assessed pursuant to the Policy's definitions of Defense
3  Costs or Loss.  Nowhere does Progressive assert that fees
4  incurred pursuing a claim are categorically uncovered as
5  "defense costs."  There is no question of law in dispute
6  here.
7
8      The Bank states, "The _extent_ to which [the Bank's]
9  fees meet that standard [of "reasonable and necessary
10 legal fees and expenses incurred in defending or
11 investigating any Claim"] requires a factual
12 determination that is not ripe for summary judgment."
13 (Reply at 8.)  The Bank, though, has not established that
14 anything other than this question is actually disputed by
15 the parties.  The Court thus finds that Progressive's
16 Third Affirmative Defense requires a factual
17 determination that is not ripe for summary judgment.
18
19     The Court likewise finds no justification for
20 judgment as a matter of law in favor of either party on
21 Progressive's Eighth Affirmative Defense.  The Bank
22 asserts that Progressive "is not entitled to make a
23 cursory and wholesale denial of _eighty percent_ of [the
24 Bank's] costs of defense improperly relying on the
25 allocation provision without undertaking the analysis
26 required under the Policy."  (MSJ at 18-19.)  This may be
27 so, but the Bank submits no sufficient evidence to
28

1    establish that Progressive's denial of 80% of the defense

2    costs was cursory and lacking the analysis required by

3    the Policy.  Likewise, Progressive submits no sufficient

4    evidence to establish that its coverage decisions,

5    including allocation, are consistent with the Policy.

6

7        Therefore, the Court DENIES the Bank's Motion for and

8    Progressive's Request for Partial Summary Judgment on

9    Progressive's Third and Eighth Affirmative Defense.

10

11   **V. PROGRESSIVE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS
     TO THE ISSUES OF (1) PRE-TENDER FEES AND COSTS AND (2)**

12   **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

13

     **A.   Summary Judgment as to Pre-Tender Fees and Costs**

14

15       As a preliminary matter, the Court notes an

16   inconsistency in Progressive's framing of the issue on

17   which it seeks summary judgment.  In its MSJ, Progressive

18   states that it seeks a determination that the Bank "is

19   not entitled to recover fees and costs incurred before

20   [the Bank] gave notice of the claims to PROGRESSIVE, i.e.

21   pre-tender fees."  (MSJ at 1.)  Similarly, Progressive's

22   proposed conclusion of law states that it "is not

23   obligated to indemnify [the Bank] for any attorneys' fees

24   and costs incurred by [the Bank] prior to the date(s) on

25   which [the Bank] tendered written notice to PROGRESSIVE

26   requesting a defense to the underlying matters that are

27   identified in [the Bank's] First Amended Complaint."

28

1 (SUF – Conclusions of Law ¶ 1.)

2

3      The inconsistent version of this statement, and the

4 one relied on by the Bank on the first page of its

5 Opposition, is in Progressive's Notice of the MSJ. (Doc.

6 No. 61.)  In the Notice, Progressive states that it is

7 moving for summary judgment against the Bank "on the

8 grounds that [the Bank] cannot recover any attorneys'

9 fees and costs incurred by [the Bank] prior to the date

10 on which it tendered the defense to PROGRESSIVE on *each*

11 of the underlying matters identified in [the Bank's]

12 First Amended Complaint, i.e. the Andrew Gay Matter, the

13 David Kagel Matter, the Ida Pyle, Judith Rudges, Beverly

14 Baker Matter, the Donald Zimmerman Matter, the Falaguerra

15 Matter and the Porter Matter."  (Notice of Motion at 1

16 (emphasis added).)

17

18      By including the language "each of the underlying

19 matters," Progressive is asking for an additional

20 determination regarding how the underlying claims should

21 be construed, a request that is absent from the concise

22 statements in the Introduction to the MSJ and the

23 Conclusion of Law.  The Court finds it reasonable to

24 interpret Progressive's proposed Conclusion of Law, which

25 it submits as part of its SUF specifically for the Court

26 to adopt, as the best articulation of the issue intended

27 to be before the Court.

28

## 1.   Undisputed Facts

The following material facts are sufficiently supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for purposes of the Bank's Motion for Partial Summary Judgment.  L.R. 56-3 (facts not "controverted by declaration or other written evidence" are assumed to exist without controversy); Fed. R. Civ. P. 56(e)(2) (stating that where a party fails to address another party's assertion of fact properly, the court may "consider the fact undisputed for purposes of the motion").  To the extent they are material to Progressive's MSJ, the Court incorporates its findings of undisputed facts from the Bank's first and second MSJs, as discussed above.

In Section VIII of the Policy, titled "**Defense and Settlement,**" under the subsection heading "**No Duty to Defend,**" the Policy sets forth,

(1)  Amounts incurred as **Defense** Costs will reduce and shall be part of and not in addition to the applicable Limit of Liability.  It shall be the duty of the **Insured** and not the duty of the **Insurer** to defend **Claims**.  The **Insured** shall only retain counsel that is mutually agreed upon with the **Insurer,** consent for which shall not be unreasonably withheld.

(2)  The I**nsured** shall not incur **Defense Costs,** admit liability for, settle, or offer to settle any **Claim** without the **Insurer's** prior written consent, which shall not be unreasonably withheld. The **Insurer** shall be entitled to full information

1      and all particular it may request in order to
       reach a decision as to such consent.
2  (SUF ¶ 44; SGI ¶ 44; Policy at 17.)

3

4      In the PBR Matter, the Bank incurred alleged defense

5  costs before tendering the defense to Progressive.  (SUF

6  ¶¶ 11-16; SGI ¶¶ 11-16.)  In the Gay Matter, the Bank

7  incurred alleged defense costs before tendering the

8  defense to Progressive.  (SUF ¶¶ 17-22; SGI ¶¶ 17-22.)[10]

9  The Bank purports to dispute Progressive's fact that the

10 Bank incurred fees in the PBR litigation prior to March

11 7, 2011, the date the Bank tendered.  (SUF ¶¶ 12, 16.)

12 The Bank states that it is "[d]isputed that March 7, 2011

13 is the date notice to Progressive of the P.B.R.

14 litigation is deemed to have occurred under the Policy."

15 (SGI ¶¶ 12, 16.)  Regarding Progressive's submitted fact

16 that the Bank incurred fees in the Gay litigation prior

17 to March 31, 2011, the date of tender (SUF ¶¶ 18, 22),

18 the Bank states that it is "[d]isputed that March 31,

19 _____
        [10] The Bank objects to the supporting evidence for
20 SUF ¶ 16 and SUF ¶ 22, which consists solely of a
   Declaration from one of Progressive's attorneys.
21 (Billings Decl., ¶ 4.)  SUF ¶ 16 states, "[The Bank]
   incurred $8,955.90 *prior* to [the Bank's] March 7, 2011
22 tender."  Progressive submits, and the Bank objects to,
   similar facts containing different monetary figures for
23 each of the claims. (See SUF ¶¶ 22, 28, 34, 42.)  The
   basis for the Bank's objection is that the evidence
24 submitted lacks the foundation to establish the amount of
   fees allegedly incurred.  The only question before the
25 Court, though, is whether Progressive is obligated to
   indemnify the Bank for pre-tender fees; the amount of
26 those fees is immaterial to that determination.  Thus,
   the Court makes no finding on whether the amount of pre-
27 tender fees submitted by Progressive as a proposed fact
   is established, and does not rule on the Bank's related
28 objection.

                              44

1   2011 is the date notice to Progressive of the Gay

2   Litigation is deemed to have occurred under the Policy"

3   (SGI ¶¶ 18, 22).  To dispute Progressive's submitted

4   facts, the Bank offers evidence that supports its

5   argument that, under the Policy, some of the underlying

6   matters should be construed as "one claim" for the

7   purpose of tendering the defense.  (See SAUF ¶¶ 7-12.)

8   This evidence, regardless of how other Policy provisions

9   are construed, does not sufficiently dispute the fact

10  that the Bank incurred pre-tender costs, as elaborated on

11  below.

12

13      In the PBR Matter, the undisputed facts establish

14  that (1) a complaint was filed against the Bank on March

15  1, 2011 (SUF ¶ 11; SGI ¶ 11); (2) the Bank tendered its

16  defense of the PBR litigation to Progressive on March 7,

17  2011 (SUF ¶ 12; SGI ¶ 12); and (3) the Bank incurred some

18  amount of fees and costs before tendering the defense to

19  Progressive on March 7, 2011 (SUF ¶ 16; SGI ¶ 16).  The

20  Bank submits facts to show that, for the purpose of

21  tendering the defense, the PBR Matter and the Falaguerra

22  Matter should be treated as "one claim."  (SAUF ¶ 12.)

23  The Bank states that it tendered its defense in the

24  Falaguerra Matter on April 7, 2011.  (Id. ¶ 13.)[11]

25  Therefore, even if the two matters were treated as one

26  claim, the Bank submits no evidence to dispute

27  ――――――――――――――――――――
    [11] This fact is disputed (SUF ¶ 40; SGI ¶ 40; SAUF ¶

28  13), but it is immaterial to the present issue of whether
    the Bank incurred any pre-tender fees.

Progressive's fact that the Bank incurred fees and costs in the Pyle matter prior to tendering the defense.

In the Gay Matter, the undisputed facts establish that (1) a complaint was filed against the Bank on February 28, 2011 (SUF ¶ 17; SGI ¶ 17); (2) the Bank tendered its defense of the Gay litigation to Progressive on March 31, 2011 (SUF ¶ 18; SGI ¶ 18); and (3) the Bank incurred some amount of fees and costs before tendering the defense to Progressive on March 31, 2011 (SUF ¶ 22; SGI ¶ 22). The Bank submits facts to show that, for the purpose of tendering the defense, the Gay Matter and the Kagel Matter should be treated as "one claim." (SAUF ¶ 11.) The Bank does not submit evidence or propose facts regarding when the Kagel defense was tendered. Progressive submits facts and evidence establishing that the Kagel defense was tendered on August 4, 2011. (SUF ¶ 24; SGI ¶ 24.) Therefore, even if the two matters were treated as one claim, the Bank submits no evidence to dispute Progressive's fact that the Bank incurred fees and costs in the Gay matter prior to tendering the defense.

### 2.  Genuine Issues of Material Fact

The Bank raises several purported factual disputes and invokes questions of law that could change the Court's analysis of those factual disputes.

46

1    Nevertheless, the Court need not resolve those issues,
2    which are immaterial to the narrow question of whether
3    Progressive is obligated to indemnify the Bank for pre-
4    tender costs.  To appropriately assess whether
5    Progressive is entitled to judgment as a matter of law on
6    this issue, the Court must first find that there is a
7    genuine controversy for the Court to properly resolve.
8    The Court will not make a declaration of law that bears
9    no relevance to the instant matter.  Thus, to find this
10   issue appropriate for judgment as a matter of law, the
11   Court need only find preliminarily that the
12   uncontroverted facts establish that the Bank incurred any
13   amount of fees and costs regarding any matters in the
14   underlying litigation prior to the Bank's tendering the
15   defense in that matter to Progressive.  The Court makes
16   such a finding here and thus proceeds to determine
17   whether Progressive is entitled to judgment as a matter
18   of law.
19
20        **3.   Judgment as a Matter of Law**
21
22        In its MSJ, Progressive cites authority establishing
23   the enforceability of provisions like the Policy's
24   requirement of written consent prior to incurring any
25   defense costs.  On page nine of the MSJ, Progressive
26   quotes the following language from <u>Jamestown Builders,</u>
27   <u>Inc. v. General Star Indem. Co.</u>, 77 Cal. App. 4th 341,

28

349-350 (1999): "[I]t is only when the insured has requested and been denied a defense by the insurer that the insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent, and under the compulsion of that refusal undertake his own defense at the insurer's expense."

The Bank argues that "[t]he logic underlying the exclusion of pre-tender fees is inapplicable where, as here, Progressive owes no duty to defend and as such never undertakes [the Bank's] defense." (Opp'n at 8.) The Bank does not argue that provisions excluding pre-tender fees are unenforceable when there is no duty to defend, nor does it provide any reason why two parties could not assent to such a provision in a contract, as appears to be the case here. All the Bank does is note that this matter involves a duty to indemnify provision, while the authorities cited by Progressive involved duty to defend provisions.

The Bank further argues that, in light of other provisions in the Policy, the Bank's defense of some of the underlying matters should be construed as having been tendered at an earlier date than that alleged by Progressive. (See Opp'n at 8-9.) This matter of contractual interpretation is not necessary to resolve here and it has not been properly brought before the

1  Court.  As discussed above regarding the PBR and Gay
2  Matters, the undisputed facts establish that, even if the
3  Bank is correct that the Gay and Kagel matters should be
4  treated like "one claim" and that the PBR and Falaguerra
5  Matters should be treated like "one claim" for tendering
6  purposes, the Bank still incurred some amount of pre-
7  tender fees and costs in the PBR and Gay matters.

8

9      Therefore, as a matter of law, the Court finds that
10  the parties agreed in the Policy to the pre-tender clause
11  and that Progressive is not obligated to indemnify the
12  Bank for any attorneys' fees and costs it incurred prior
13  to sending written notice to Progressive requesting a
14  defense.

15

16  **B.   Summary Judgment as to the Bank's Claim for Breach of**
17  **the Covenant of Good Faith and Fair Dealing**

18      Under California law, contractual insurance policies
19  contain an implied covenant of good faith and fair
20  dealing, which is characterized as "insurance bad faith"
21  and for which a plaintiff can receive tort damages.  See
22  Adams v. Allstate Ins. Co., 187 F. Supp. 2d 1219, 1226
23  (C.D. Cal. 2002); Egan v. Mutual of Omaha Ins. Co., 24
24  Cal.3d 809, 818 (1979).  "Success under the claim
25  requires a showing that the insurer erroneously failed to
26  pay benefits under an insurance policy, and the failure
27  to do so was without proper cause."  Adams, 187 F. Supp.

28

2d at 1226.  Bad faith liability is determined by "whether the refusal to pay policy benefits . . . was reasonable."  Chateau Chamberay Homeowners Ass'n v. Assoc. Int'l Ins. Co., 90 Cal. App. 4th 335, 346 (2001). "While the question of whether an insurer has acted in bad faith is generally one of fact, where there is a genuine issue of an insurer's liability under a policy, a court can conclude that an insurer's actions in denying the claim were not unreasonable as a matter of law." Adams, 187 F. Supp. 2d at 1226.  The defendant has the burden of showing reasonableness.  Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001).  "When an insured bases claims for bad faith on several different claims decisions or courses of conduct, a[n insurance] carrier should not be permitted to defeat all of them by showing that there was a genuine dispute as to just one." Bernstein v. Travelers Ins. Co., 447 F. Supp. 2d 1100, 1111 (N.D. Cal. 2006).

### 1.  Undisputed Facts

The parties do not submit facts or evidence specific to Progressive's MSJ on this claim.  To the extent they are material to Progressive's MSJ on this claim, the Court incorporates its findings of undisputed facts from the Bank's two MSJs and Progressive's MSJ on the issue of pre-tender fees, as discussed above.

1        **2.   Genuine Issues of Material Fact**

2

3        As to all five relevant underlying matters, excluding

4    the Porter Matter, Progressive claimed that the legal

5    fees and costs "expended by [the Bank] pursuing its

6    claims against [the borrowers] are not Covered Loss or

7    Defense Costs and will not be reimbursed or applied

8    toward the retention" and thus "an allocation of twenty

9    percent (20%) to covered matters is appropriate."  (Bank

10   MSJ 2 SUF ¶¶ 34-40; Bank MSJ 2 SGI ¶¶ 34-40.)  As

11   discussed above, the Court denies the Bank's motion for

12   summary judgment as to Progressive's Third and Eighth

13   Affirmative Defenses because neither party had submitted

14   sufficient facts to establish whether Progressive

15   correctly determined that the Bank's legal expenses were

16   not covered as Defense Costs under the Policy.  Likewise,

17   Progressive has not submitted sufficient evidence to show

18   that its coverage decision was reasonable.

19

20       Thus, the Court finds that genuine issues of material

21   fact exist regarding whether the Bank's legal expenses in

22   the five matters constituted covered Defense Costs under

23   the Policy.  Given the lack of submitted facts and

24   evidence regarding Progressive's grounds for that

25   determination, the Court cannot find that Progressive

26   acted reasonably and did not breach the implied covenant

27   of good faith and fair dealing.  Progressive has not

28

shown that, "under the governing law, there can be but one reasonable conclusion as to the verdict."  Anderson, 477 U.S. at 250.  Therefore, the Court DENIES Progressive's Motion for Partial Summary Judgment as to the Bank's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

## VI. CONCLUSION

For the foregoing reasons, the Court
1.   **DENIES** the Bank's Motion for Partial Summary Judgment on Progressive's Fifth Affirmative Defense; and **GRANTS** summary judgment in favor of Progressive on its Fifth Affirmative Defense (Doc. No. 22);
2.   **DENIES** the Bank's Motion for Partial Summary Judgment as to the Issue of Cessation and Progressive's Third and Eighth Affirmative Defenses (Doc. No. 40); and
3.   **GRANTS** Progressive's Motion for Partial Summary Judgment as to the Issue of Pre-Tender Fees; and **DENIES** Progressive's Motion for Partial Summary Judgment as to the Bank's claim for Breach of the Covenant of Good Faith and Fair Dealing (Doc. No. 60).

Dated:  April 3, 2013                        _____
                                             Jesus G. Bernal
                                             United States District Judge